IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHRISTOPHER D. GROOM, et al.       *

            Plaintiffs              *

      vs.                           * CIVIL ACTION NO. MJG-16-2624

BOMBARDIER TRANSPORTATION          *
SERVICES USA CORP., et al.
                                   *
            Defendants
                                   *

*       *       *       *       *       *       *       *       *       *

MEMORANDUM AND ORDER RE:
MOTION FOR JUDGMENT ON THE PLEADINGS AND
MOTION TO AMEND THE COMPLAINT

The Court has before it Defendant's Motion for Judgment on

the Pleadings [ECF No. 40], Plaintiffs' (Second) Motion to Amend

the Complaint [ECF No. 50], and the materials submitted relating

thereto.  The Court has held a hearing and has had the benefit

of the arguments of counsel.

I.   BACKGROUND

     A.   Asserted Claims

     Christopher D. Groom and Adam J. Quigley (together,

"Plaintiffs"), are former employees of Bombardier Transportation

Services ("Bombardier").  Plaintiffs assert claims for

retaliation against Defendants Bombardier and Ronald Russell

(together, "Defendants"), under the Federal Rail Safety Act

("FRSA"), 49 U.S.C. § 20109, as well as Maryland state law tort claims: defamation, conspiracy, battery, intentional infliction of emotional distress, negligent hiring and training, and tortious interference.

B.  Alleged Facts

The "facts" set forth herein are stated as alleged by Plaintiffs in the Second Amended Complaint ("SAC") [ECF No. 50-2].[1]  Defendants do not agree with many of Plaintiffs' factual allegations.

Since 2013, Bombardier has operated the State of Maryland's MARC commuter train service.  SAC ¶ 15.

At times relevant to the instant case, Plaintiff Christopher Groom ("Groom") was a certified locomotive engineer. Groom worked as Road Foreman of Engines for Bombardier from May 2013 until December 2013, and was officially terminated a month later on January 9, 2014.  Id. ¶ 12.  Plaintiff Adam Quigley ("Quigley") worked as Transportation Coordinator for Bombardier from May 2013 until August 2015.  Id. ¶ 13, ¶ 16.

During the course of their employment, Plaintiffs were supervised by Defendant Ronald Russell ("Russell"), the Rail

---

[1] The Court is granting Plaintiffs' Second Motion to Amend the Complaint.  All Complaint citations herein shall refer to the Second Amended Complaint (ECF No. 50-2).

Operations Superintendent, a senior position at the railroad company. Id. ¶ 18.

Pursuant to 49 C.F.R. § 240, locomotive engineers must be certified and recertified every three years. When seeking certification or recertification for an employee, a railroad is required to follow its approved certification program under 49 C.F.R. § 240.101, which includes procedures for evaluating the employee's prior safety conduct, visual and hearing acuity, and knowledge and skills testing, among other criteria.

One of Groom's responsibilities was to recertify Bombardier engineers. Id. ¶ 24. In the fall of 2013 and mid-November 2013, Groom informed Russell that although some of the engineers would need to be recertified soon, their certification files were incomplete and did not contain some of the information required by 49 C.F.R. Part 240. Id. ¶ 22-23. Russell told Groom to not worry about the lack of documentation and instructed him to recertify those engineers anyhow.

Groom refused to recertify the engineers, even though Russell, on at least four occasions, put pressure on Groom to recertify the engineers between mid-November and mid-December 2013. Id. ¶ 25-26.

On December 26, 2013, Groom was requested to attend a lunch meeting with Joshua Basore ("Basore") and Christopher Difatta

("Difatta"), Bombardier Trainmasters who reported to Russell.
Id. ¶ 29-30.  During the lunch, Difatta asked Groom to step away
for a private conversation and Groom did so.  While Groom was
absent from the table, his drink was allegedly adulterated by
Basore with Adderall, an amphetamine.[2]  Id. ¶ 30.  Groom was
subjected to a drug test after the lunch and was notified four
days later that he had tested positive for amphetamines.  Id. ¶
32-33.  Groom had never used amphetamines at any time in his
life prior to the lunch.  Id. ¶ 40.  As a consequence of the
drug test result, Groom's engineer and conductor certifications
were suspended and revoked, and he was removed from service.
Id. ¶ 34-37.  Groom challenged the revocation at an
administrative hearing, but Bombardier upheld the suspension and
revocation of his certifications.  Id. ¶ 37-38.  The decision
was affirmed in part by the Federal Railroad Administration.
Id. ¶ 39.

In April or May of 2015, Quigley was requested by Russell
to obtain an engineer certification.  Id. ¶ 54.  Russell
allegedly pressured him to obtain the certification even when he

---

[2] Previously, on December 17, 2013, Basore told Quigley of the
plan that Russell had suggested to drug Groom and to cause him
to fail a drug test.  Id. ¶ 47-48.  On December 20, 2013,
Quigley met Basore's brother Keaton Schreiner, who allegedly
provided the Adderall that was placed in Groom's drink.  Id. ¶
49.  Quigley did not inform Groom of what he had learned about
the plan.

had not satisfied all the elements of the certification program.

Quigley refused to do so.  <u>Id.</u>  On July 9, 2015, Quigley was

subjected to a random drug test.  <u>Id.</u> at ¶ 60.  He tested

positive for Adderall, despite having never taken Adderall in

his life.  <u>Id.</u> ¶ 60-64.  Quigley immediately suspected that he

had been drugged before the test, although he was not sure by

whom.  <u>Id.</u> at 72.  On August 11, 2015, Quigley's Student

Engineer Certification was revoked.  <u>Id.</u> at 73.  He also

challenged this revocation at an administrative hearing, but was

informed by Bombardier that the evidence produced was sufficient

to uphold the revocation.  <u>Id.</u> at 74.

On August 3, 2015, Quigley met Groom and informed him about

the December 2013 plan to drug Groom and terminate his

employment.  <u>Id.</u> at 80-81.  On August 26, 2015, Groom and

Quigley filed a FRSA whistleblower complaint with the

Occupational Safety and Health Administration ("OSHA").  <u>Id.</u> ¶

7.  When OSHA did not issue a final decision within the allotted

210 days, Plaintiffs filed an action in this Court.  <u>See</u> 49

U.S.C. § 20109(d)(3).


II.   <u>MOTION FOR JUDGMENT ON THE PLEADINGS</u>

      A.   <u>LEGAL STANDARD</u>

      The legal standard for a motion for judgment on the

pleadings is the same as the standard for a motion to dismiss.
Drager v. PLIVA USA, Inc., 741 F.3d 470, 474 (4th Cir. 2014)
("The standard of review for Rule 12(c) motions is the same as
that under Rule 12(b)(6).").

Therefore, a motion for judgment on the pleadings only
tests the legal sufficiency of a complaint and does not resolve
the merits of the plaintiff's claims or any disputes of fact.
Id.  A motion for judgment on the pleadings "should only be
granted if, after accepting all well-pleaded allegations in the
plaintiff's complaint as true and drawing all reasonable factual
inferences from those facts in the plaintiff's favor, it appears
certain that the plaintiff cannot prove any set of facts in
support of his claim entitling him to relief."  Id.

A complaint need only contain "'a short and plain statement
of the claim showing that the pleader is entitled to relief,' in
order to 'give the defendant fair notice of what the . . . claim
is and the grounds upon which it rests.'"  Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 555 (2007) (citations omitted).  However,
conclusory statements or "a formulaic recitation of the elements
of a cause of action will not [suffice]."  Id.  A complaint must
allege sufficient facts "to cross 'the line between possibility
and plausibility of entitlement to relief.'"  Francis v.
Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Twombly,

550 U.S. at 557).

Inquiry into whether a complaint states a plausible claim is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. (quoting Twombly, 550 U.S. at 557).  Thus, if "the well-pleaded facts [contained within a complaint] do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  Id.  (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (alteration in original)).

B.   DISCUSSION

i.   FRSA Retaliation

"Congress enacted the FRSA 'to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents.'"  Conrad v. CSX Transportation, Inc., 824 F.3d 103, 107 (4th Cir. 2016).  The FRSA protects railroad employees from disciplinary action for "provid[ding] information . . . regarding conduct that which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to railroad safety or security," 49 U.S.C. § 20109(a)(1), and for "reporting, in good faith, a hazardous safety or security condition," id. § 20109(b)(1)(A).

7

To establish a prima facie case of retaliation, a plaintiff must "establish that: '(1) [the employee] engaged in [a] protected activity; (2) the employer knew that [the employee] engaged in the protected activity; (3) [the employee] suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action.'" Conrad, 824 F.3d at 107. If the employee establishes the prima facie case, the burden then shifts to the employer to demonstrate "by clear and convincing evidence" that it would have taken the same action in the absence of the protected activity. Id.

The FRSA employee protections are subject to a statute of limitations. An employee who believes he has been retaliated against must file a complaint with OSHA no more than 180 days after the date on which the alleged violation occurs. 49 U.S.C. § 20109(d)(2)(A)(ii). The Fourth Circuit does not apply the discovery rule (i.e., starting the clock only when plaintiff discovers the claim),[3] but this 180 day period may be subject to equitable modification or equitable tolling. See, e.g., In the Matter of Michael S. Jenkins, ARB CASE NO. 13-029, 2014 WL 2536887, at *4 (Dep't of Labor May 15, 2014) (remanding the decision to the ALJ to consider, among other issues, whether

---

[3] See Hamilton v. 1st Source Bank, 928 F.2d 86, 90 (4th Cir. 1990) ("We therefore reject the "discovery" rule urged by Hamilton.").

equitable modification should be applied in an FRSA retaliation case).

Equitable tolling is based primarily on the view that "a defendant should not be permitted to escape liability by engaging in misconduct that prevents the plaintiff from filing his or her claim on time." English v. Pabst Brewing Co., 828 F.2d 1047, 1049 (4th Cir. 1987). "To invoke equitable tolling, the plaintiff must therefore show that the defendant attempted to mislead him and that the plaintiff reasonably relied on the misrepresentation by neglecting to file a timely charge." Id. In an analogous employment discrimination context, the Fourth Circuit stated that the limitations period "may be subject to equitable modification when warranted by the conduct of the employer," including equitable tolling, which "focuses on the plaintiff's excusable ignorance of the employer's discriminatory act." Felty v. Graves-Humphreys Co., 785 F.2d 516, 519 (4th Cir. 1986).

Here, Defendants argue that Groom did not timely exhaust his administrative remedies under the FRSA and is therefore time-barred from bringing the action.[4] Groom was notified on March 19, 2014 that his engineer and conductor services were

_____

[4] Defendants concede that Plaintiff Quigley's complaint was timely filed.

revoked indefinitely. SAC ¶ 38. He did not file his OSHA complaint until August 26, 2015, which is more than 180 days after the notification. Id. ¶ 38. Defendants argue that because Groom asserts that he did not knowingly ingest amphetamines, he had a duty to inquire how he could have tested positive for amphetamines as soon as the drug test came back positive. Defs.' Reply at 8, ECF No. 49. They imply that Groom should have, "by the exercise of reasonable diligence," discovered the plot to drug him by speaking to Quigley who allegedly knew of it. Id. at 8-9. Groom, on the other hand, argues that he is entitled to equitable tolling because "Defendants Bombardier and Russell conspired amongst themselves and others to keep their illegal drugging of Mr. Groom a secret." Pl.'s Opp. at 28, ECF No. 45-1.

To accept Defendants' characterization of the facts in the present context would not be proper. This is not an ordinary retaliation case in which an employee is terminated after refusing to take a certain action. In the ordinary case, the employee would immediately understand that his termination was caused by the refusal and the limitations period would rightfully begin to run. Here, Groom was terminated for having failed a drug test, which to him would have appeared to be unrelated to his refusal to re-certify the engineers. So, the

employer's allegedly discriminatory act was not simply to terminate Groom for having refused to re-certify the engineers, but to secretly adulterate his drink to cause him to fail a drug test that led to his termination. Defendants "should not be permitted to escape liability by engaging in misconduct that prevents the plaintiff from filing his or her claim on time." Pabst Brewing Co., 828 F.2d at 1049. In this situation, Groom's ignorance of the employer's retaliatory act (i.e., putting amphetamines into his drink in order to terminate his employment) should be excused. See Felty, 785 F.2d at 519.

Defendants' argument that Groom should have a duty to investigate the cause of his positive drug test is also unconvincing. It would have been reasonable for Groom to assume something was amiss about the test itself. Indeed, Groom testified at his administrative hearing that he may have taken Claritin-D for his allergies, which could result in a false positive test for amphetamines. Def.'s Mot. J. Pleadings at 8, ECF No. 40-1. Even if Groom suspected that something was unusual about the test result, he should not be required to have made the inferential leap from that known fact to the possibility that his work colleagues obeyed orders from his boss to secretly drug him in order to terminate him for his refusal to recertify the engineers. Moreover, the facts do not suggest

that Groom received information about this plot from Quigley earlier than he did.  The Defendants should not be able to avoid a claim simply because the _method_ of termination (_i.e.,_ causing an employee to fail a drug test) was unusual enough to avoid immediate suspicion.

As to the merits of the FRSA retaliation claim, Defendants assume, for the purposes of this motion, that Plaintiffs meet the first three prongs of the _Conrad_ test:  that they engaged in a protected activity, that Bombardier was aware of the activities, and that they suffered an adverse action.  Def.'s Mot. J. Pleadings at 14, ECF No. 40-1.  They only challenge whether Plaintiffs have pled sufficient facts to allege that their protected activity was a "contributing factor" in their termination.  _Id._

"A contributing factor is 'any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision.'"  _Feldman v. Law Enf't Assocs. Corp.,_ 752 F.3d 339, 348 (4th Cir. 2014).[5]  This element is "broad and forgiving," and is "specifically intended to overrule existing case law."  _Id._

---

[5] Although _Feldman_ addresses a retaliation claim under the Sarbanes-Oxley Act, the FRSA employs the same standard and is subjected to the same analysis.  _See Conrad, Inc.,_ 824 F.3d at 107, _DeMott v. CSX Transportation, Inc.- Baltimore Div.,_ 2017 WL 3588278, at *2 (4th Cir. 2017).

Here, Defendants argue that because Plaintiffs were terminated due to positive drug tests, they have not shown that the protected activities (i.e., Groom's refusing to recertify the engineers, and Quigley's refusing to be certified without meeting all the requirements) were contributing factors in their terminations. Def.'s Mot. J. Pleadings at 15, ECF No. 40-1.

Again, Defendants' version of the facts cannot now be accepted. While it is true that the immediate cause of the termination was the positive drug test, Plaintiffs have alleged that they were drugged and terminated as a direct result of their respective protected activities. SAC ¶ 47, ¶ 69-71. This certainly meets the broad and forgiving standard for a "contributing factor" of termination under Feldman. The Defendants' challenge of the factual accuracy of the drugging allegations is not resolved at the current stage of the litigation. Def.'s Mot. J. Pleadings at 15, ECF No. 40-1.

Plaintiffs have stated a plausible claim for FRSA retaliation under Counts 1, 2, 3, and 4. Accordingly, Defendant's Motion for Judgment on the Pleadings [ECF No. 40] for the retaliation claim is DENIED.

ii. Defamation

To establish a prima facie case of defamation, the plaintiff must show: "(1) that the defendant made a defamatory statement to a third person, (2) that the statement was false, (3) that the defendant was legally at fault in making the statement, and (4) that the plaintiff thereby suffered harm." Indep. Newspapers, Inc. v. Brodie, 407 Md. 415, 441 (2009). A defamatory statement is one that "tends to expose a person to public scorn, hatred, contempt or ridicule, thereby discouraging others in the community from having a good opinion of, or from associating or dealing with, that person." Samuels v. Tschechtelin, 135 Md. App. 483, 543 (2000). A false statement is "not substantially correct" and the plaintiff carries the burden to prove falsity. Piscatelli v. Van Smith, 424 Md. 294, 306 (2012). The element of "fault" is established by showing either negligence ("a preponderance of the evidence") or malice ("clear and convincing evidence ... that the defendant published the statement in issue either with reckless disregard for its truth or with actual knowledge of its falsity"). See Redmonds Enter., Inc. v. CSX Transportation, Inc., No. CV CCB-16-3943, 2017 WL 2335598, at *3 (D. Md. May 30, 2017).

Maryland courts recognize a difference between defamation per se and defamation per quod:

> In the case of words or conduct
> actionable _per se_, their injurious character
> is a self-evident fact of common knowledge
> of which the court takes judicial notice and
> need not be pleaded or proved.  In the case
> of words or conduct actionable only _per
> quod_, the injurious effect must be
> established by allegations and proof of
> special damage and in such cases it is not
> only necessary to plead and show that the
> words or actions were defamatory, but it
> must also appear that such words or conduct
> caused actual damage.

_Samuels_, 135 Md. App. at 549.  Whether an alleged defamatory statement is _per se_ or _per quod_ is a question of law for the court.[6]  _Id._  If the statement is _per quod_, the jury must decide whether it carries defamatory meaning.  _Id._  "But if the statement is defamatory _per se_, and the defendant was merely negligent in making the false statement, the plaintiff must still prove actual damages," unless a plaintiff can demonstrate malice by clear and convincing evidence.  _Id._

Maryland does not appear to have a separate claim for "defamation by innuendo" that is different than defamation _per quod_.  Rather, it appears that when a court does not find defamation _per se_, defamation _per quod_ could be established by using innuendo or implication.  _See, e.g._, _Metromedia, Inc. v._

---

[6] For example, a defamatory statement that impairs another's livelihood or "adversely affects [his] fitness for the proper conduct of his business" is likely actionable _per se_.  _Samuels_, 135 Md. App. at 550, citing _Kilgour v. Evening Star Newspaper Co._, 96 Md. 16, 23–24 (1902).

Hillman, 285 Md. 161, 164 (1979) ("while, if the words used are not defamatory Per se, they must be explained by innuendo and colloquium"); Walker v. D'Alesandro, 212 Md. 163, 180 (1957) ("If the words are not considered libelous per se—in which case no innuendo is necessary—they may be actionable if coupled with allegations of special damage as being libelous per quod."); Great Atl. & Pac. Tea Co. v. Paul, 256 Md. 643, 647 (1970) (explaining that because the utterance was "slanderous per se," "there is no need here for construction or use of innuendo to see if the words can bear the defamatory meaning alleged").

Innuendo or implication cannot be used to "add to or enlarge the sense of the words used," and must be "fairly warranted by the language declared on, when that language is read, either by itself, or in connection with the inducement and colloquium." Bowie v. Evening News, 148 Md. 569 (1925). See also Batson v. Shiflett, 325 Md. 684, 724 n. 14 (1992) ("A mere inference, implication, or insinuation is as actionable as a positive assertion if the meaning is plain. The test is whether the words, taken in their common and ordinary meaning, in the sense in which they are generally used, are capable of defamatory construction.").

This court has required plaintiffs to show the following to survive the initial pleadings stage: "(1) the identity of the

maker of the defamatory statement; (2) the exact content of the defamatory statement; (3) the date on which the defamatory statement was made; (4) the persons to whom the defamatory statement was communicated; [and] (5) the date on which [Defendant] was advised by the Plaintiffs of the falsity of the defamatory statement." S. Volkswagen, Inc. v. Centrix Fin., LLC, 357 F. Supp. 2d 837, 844 (D. Md. 2005). However, subsequent decisions have noted that Southern Volkswagen "is not fairly read to establish a heightened pleading standard for defamation claims or minimum pleading requirements in order to state a claim for defamation." Lora v. Ledo Pizza Sys., Inc., No. CV DKC 16-4002, 2017 WL 3189406, at *8 (D. Md. July 27, 2017).

Maryland does not appear to adopt the theory of defamation by self-publication. See De Leon v. Saint Joseph Hosp., Inc., 871 F.2d 1229, 1237 (4th Cir. 1989) ("The district court concluded that the Maryland Court of Appeals, at least on the facts presented here, would not adopt self-publication. We do also, bearing in mind that, otherwise, the theory of self-publication might visit liability for defamation on every Maryland employer each time a job applicant is rejected."). See also Byington v. NBRS Fin. Bank, 903 F. Supp. 2d 342, 354 (D.

Md. 2012) (following <u>De Leon</u> as "the only controlling precedent before the Court at this time.").

A defendant's allegedly defamatory statements may be protected by a qualified or conditional privilege. <u>Doe v. Salisbury Univ.</u>, 123 F. Supp. 3d 748, 758 (D. Md. 2015). ("Maryland courts recognize that 'a person ought to be shielded against civil liability for defamation where, in good faith, [s]he publishes a statement in furtherance of his [or her] own legitimate interests, or those shared in common with the recipient or third parties'"). In other words, "[t]here are circumstances in which a person will not be held liable for a defamatory statement because the person is acting 'in furtherance of some interest of social importance, which is entitled protection.'" <u>Gohari v. Darvish</u>, 363 Md. 42, 55 (2001). For example, "[c]ommunications arising out of the employer-employee relationship 'clearly enjoy a qualified privilege.'" <u>Id.</u> at 56. If such a privilege has been identified, the plaintiff's claim can only survive "if he can show that the defendant acted with malice, 'defined as 'a person's actual knowledge that his [or her] statement is false, coupled with his [or her] intent to deceive another by means of that statement.''" <u>Salisbury Univ.</u>, 123 F. Supp. 3d at 758.

Finally, defamation claims in Maryland are subject to a one-year statute of limitations.  Md. Code Ann., Cts. & Jud. Proc. § 5-105.

The defamation counts are listed as Counts 11-22 in the Complaint.  However, the parties have agreed to structure their arguments in reference to twenty (20) specific statements within these Counts.  For consistency, the Court will also refer to these statement numbers 1-20, which are listed in a chart in Def.'s Mot. J. Pleadings at 19-21, ECF No. 40-1.

The relevant sections of the chart are reproduced below:

| # | Plaintiff | Alleged Defamatory Statement | Count # |
|---|-----------|------------------------------|---------|
| 1 | Groom and Quigley | "Bombardier, its agents, servants and/or employee made false statements to others, both oral and in writing, regarding [Plaintiffs'] alleged drug use and the reason for [their] termination." | 11 12 |
| 2 | Groom and Quigley | "Many other Bombardier employees were informed about [Plaintiffs'] positive drug test and termination and rumors were spread." | 11 12 17 |
| 3 | Groom and Quigley | "Amtrak employees who shared crew rooms with Bombardier employees were also informed about [Plaintiffs'] positive drug test and termination." | 11 12 17 |
| 4 | Groom And Quigley | "Bombardier, its  agent, servants and/or employees [and Defendant Russell] caused [Plaintiffs] to be required to report false statements, both oral and in writing, regarding his alleged drug use and the reason for [their] termination in explaining [their] termination and job history to others, including future employers." | 11 12 17 18 |

| 5 | Groom | Russell's alleged statement to Russell's supervisor, Jennifer Mouchantaf, in January 2014 that "Mr. Groom had not been performing his job adequately leading up to the drug test, and . . . that this must have been due to Groom's alleged drug use." | 11 |
|---|---|---|---|
| 6 | Groom | Russell's alleged statement to "others" in January 2014 that "Groom had not been performing his job adequately leading up to the drug test, and . . . that this must have been due to Groom's alleged drug use." | 11 |
| 7 | Groom | Basore allegedly stated that "Mr. Groom failed two drug tests" with the intent "to imply that Mr. Groom used drugs" to Amtrak employees Dale Corn and Howard Carter "as early as the day after Mr. Groom was removed from service with Bombardier." | 11 |
| 8 | Groom | Basore allegedly stated that "Mr. Groom failed two drug tests" with the intent "to imply that Mr. Groom used drugs" to Bombardier employees Mark Nixon and John Shifflet "as early as the day after Mr. Groom was removed from service with Bombardier." | 11 |
| 9 | Groom | "Russell, when he called Mr. Groom after his positive drug test, said to Mr. Groom 'we'll get you the help you need,' implying that Mr. Groom had used drugs." | 11 |
| 10 | Groom | "Russell, when he called Mr. Groom after his positive drug test, said to Mr. Groom 'we'll get you the help you need,' implying that Mr. Groom had used drugs, and implying that he had and would continue [to] make similar statements to other (the 'we' who would provide 'help') that Groom used drugs." | 11 |
| 11 | Groom | "Alex Clark of Bombardier sent the drug test results in the middle to end of August 2014 to Irene (last name unknown) in the human resources department of Southern California Regional Rail Authority. These statements implied that Groom used drugs." | 11 |

| 12 | Groom And Quigley | "Bombardier, its agents, servants and/or employees [and Defendant Russell] made false statements by terminating [Plaintiffs] and thereby communicating that [they] did something wrong deserving of termination from employment." | 11 12 17 18 |
|---|---|---|---|
| 13 | Quigley | "Russell sent out a superintendent notice about Mr. Quigley, stating that Mr. Quigley no longer worked for Bombardier, and if Mr. Quigley contacted anyone they should contact Russell.  The notice was labeled 'please distribute and post.' The notice included Mr. Quigley's picture." | 12 18 |
| 14 | Quigley | "Basore told fellow Bombardier employees that Mr. Quigley failed his drug test because he left the country, came back, and tested positive for marijuana. Basore made these statements while at work . . . on or about August 20, 2015." | 12 |
| 15 | Quigley | "Basore made Mr. Quigley's alleged drug use a regular topic of conversation in Bombardier's crew rooms and told fellow Bombardier employees that Mr. Quigley used drugs." | 12 |
| 16 | Quigley | "Basore made all of these statements [in Paragraph 173] to Bombardier employees, including Conductor Mike Sansone, and Conductor Brett Jackson." | N/A |
| 17 | Quigley | Mr. Quigley "self-reports the positive drug test results." | 12 |
| 18 | Quigley | "On or about December 1, 2016, Defendant Bombardier released Mr. Quigley's positive drug test results to Genesse & Wyoming." | 12 |
| 19 | Quigley | "A Bombardier human resources employee, believed to be Alex Clark, also falsely stated on or about December 1, 2016 that Mr. Quigley did not complete a DOT-required substance abuse program (required after his positive drug test result before he can return to safety-sensitive work)." | 12 |
| 20 | Groom and Quigley | "Russell made false statements, both oral and in writing, regarding [Plaintiffs'] alleged drug use and the reason for [their] termination." | 17 18 |

## 1. Background Statements

Plaintiff concedes that Statements 1, 2, 3, and 4 are not actionable statements by themselves but were included to set the stage for the other statements. Accordingly, on their own, they cannot form the basis of Plaintiff's defamation.

## 2. Statements Challenged as Untimely

Defendants argue that Statements 5-10 are barred by the statute of limitations as to Groom. Plaintiff Groom alleges in the Complaint that he did not know of these statements until December 2016, "when he was informed of them by counsel in connection with the filing of Plaintiffs' Motion to Amend." SAC ¶ 160.

The Complaint in this case was filed July 19, 2016, and any alleged defamatory statement must have been made after July 19, 2015. Plaintiffs concede that Statement 11 is untimely. For Statements 5-10, the Court has applied equitable tolling to the FRSA retaliation claim, and will also apply it for the defamation claims. The allegedly defamatory statements relate to Groom's drugging, which – taking Plaintiffs' facts as true – was withheld from Groom by the Defendants. In other words, Defendants are alleged to have misled Groom about the true reason behind the positive drug test, and Groom reasonably

relied upon that misrepresentation in failing to file a
defamation action earlier.  See English v. Pabst Brewing Co.,
828 F.2d at 1049.

Accordingly, Statements 5-10 are timely brought before this
Court, but Statement 11 shall be dismissed as untimely.


### 3. Statements Challenged as Unpublished

Defendants argue that Statement 9 was never "published" to
a third party, i.e., it was only a statement between Defendant
Russell and Groom.  Def.'s Mot. J. Pleadings at 22, ECF No. 40-
1.  Plaintiffs argue that Russell's statement "impl[ies]" that
Russell "had and would continue make [sic] similar statements to
others."  SAC ¶ 162.  However, this statement does not allege a
plausible claim that similar statements were in fact made to
others.  Accordingly, Plaintiffs have not met the burden of
showing a prima facie case of defamation as to Statement 9.


### 4. Statements Challenged as Unrecognized Self-Publication

Maryland has not adopted the theory of self-publication.
De Leon, 871 F.2d at 1237; Byington, 903 F. Supp. 2d at 354.
Statement 17 simply states that Quigley was made to "self-

report[]" his positive drug results.  Accordingly, Plaintiff has not alleged a plausible claim as to Statement 17.

### 5. Statements Challenged as True or Relying on Innuendo or Implication

Defendants argue that of the remaining Statements, Statement 18 should be dismissed because it is literally true, and Statements 7, 8, and 12 should be dismissed because they rest on a theory of "defamation by innuendo" which Maryland does not recognize.

For present purposes it is clear that Maryland recognizes that a defamation action can be maintained without relying solely on the literal meaning of a statement.  The test is "whether the words, taken in their common and ordinary meaning, in the sense in which they are generally used, are capable of defamatory construction."  Batson, 325 Md. at 724 n. 14.

As an initial matter, the Court finds that these statements could constitute defamation per se, because they were made in the context of Plaintiffs seeking employment in their field of expertise.  It is at least plausible that, especially when seeking an employment opportunity, such a statement about Plaintiffs' drug use during employment could discourage prospective employers from considering them as potential hires.

Even if the statements are defamation per quod, Statements 7, 8, 12, and 18 are all statements that may be literally true (i.e. Plaintiffs failed the drug test), but the Court finds that a jury could reasonably find that they were intended to imply that Plaintiffs used drugs during the course of their employment (not that the Plaintiffs were drug users more generally). The jury will be tasked with determining whether this defamatory meaning is readily apparent. Samuels, 135 Md. App. at 549 ("If the statement is per quod, the jury must decide whether it carries defamatory meaning.").

Accordingly, Statements 7, 8, 12, and 18 will not be dismissed as true or requiring implication or innuendo to discern their defamatory meaning.

## 6. Statements Challenged as Vague

Defendants challenge Nos. 6, 10, 14, 15, and 20 as too vague to state a claim under Southern Volkswagen. But the factors in Southern Volkswagen are "not fairly read to establish[] a heightened pleading standard for defamation claims." Lora, 2017 WL 3189406, at *8.

The Court finds that most of these statements state a plausible claim for relief. Statement 6's reference to "among others" was made in connection with the allegation that the

statement was made to Russell's supervisor, Jennifer Mouchantaf. The Court will not prevent Plaintiff from conducting discovery on whether the same or similar statements were made to others at Bombardier in Ms. Mouchantaf's position. Statements 14 and 15 adequately allege the identity of the speaker (Basore), the content of the statement (Quigley's alleged drug use), the date of the statement (on or about August 20, 2015), and the persons to whom the statement was made (Bombardier employees in Bombardier's crew rooms). Statement 20 is properly viewed as a summary statement of facts that were already alleged in the preceding paragraphs.

However, Statement 10 does not meet the pleading requirements. It states that Russell's statement to Groom ("We'll get you the help you need") implied that Russell would make similar statements to unidentified "others." It does not allege that a similar statement was actually made, or to whom those statements were made.

Whether or not the Plaintiff can prove its claims at trial is not relevant to this stage of the litigation. Accordingly, Statements 6, 14, 15, and 20 will not be dismissed as vague, but Statement 10 will be dismissed as vague.

## 7. Statements Challenged as Subject to a Qualified or Common Interest Privilege

Defendants challenge Statements 5, 6, 8, 13, 14, 15, 16, 18, and 19 as subject to a qualified or common interest privilege. Even assuming that these privileges are applicable, Plaintiffs have alleged that there was actual malice. Actual malice is defined as "'a person's actual knowledge that his [or her] statement is false, coupled with his [or her] intent to deceive another by means of that statement.'" Salisbury Univ., 123 F. Supp. 3d at 758. Each of these Statements alleges that Russell, Basore, Bombardier, or an agent of Bombardier made a statement regarding Plaintiffs' positive drug test results with actual knowledge that he was conveying a false message (i.e., that Plaintiffs used drugs during the course of their employment). Accordingly, Statements 5, 6, 8, 13, 14, 15, 16, 18, and 19 will not be dismissed as protected under a common interest privilege.

In summary,

- Statements 1-4 and 20 are background or summary statements that cannot form the basis of Plaintiffs' defamation claims.

- Any claim based on Statement 9 shall be dismissed because it was not published to a third party.

- Any claim based on Statement 10 shall be dismissed as too vague.

- Any claim based on Statement 11 shall be dismissed as untimely.

- Any claim based on Statements 5-8 and 12-19 shall not be dismissed and remain pending.

### iii. Civil Conspiracy

In Maryland, "[t]o recover damages for civil conspiracy, it must be shown that there was an agreement <u>by at least two persons</u> to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, and that the act or means used resulted in damage to the plaintiff." <u>Baltimore-Washington Tel. Co. v. Hot Leads Co., LLC</u>, 584 F. Supp. 2d 736, 744 (D. Md. 2008) (emphasis in original). However, "a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." <u>Id.</u> Two exceptions to this "intracorporate conspiracy doctrine" exist, which allow employees of a corporation to be held liable as conspirators: (1) when the agents have an "independent legal stake in achieving the corporation's legal objective" and (2) where the "acts of the employees were unauthorized by the corporate defendant." <u>Id.</u>

Plaintiffs argue that because Keaton Schreiner (who is Mr. Basore's brother and not an employee of Bombardier) allegedly

provided the Adderall used in the drugging, the intracorporate conspiracy doctrine does not apply.  Pl.'s Opp. at 60, ECF No. 45-1.  However, the plaintiffs have asserted the claims only against Bombardier and Ronald Russell, who is Rail Operations Superintendent of Bombardier.  In its Complaint, Plaintiffs states that "Bombardier, its agents, servants, and/or employees, Russell, Mr. Basore, and/or Mr. Difatta formed an agreement to commit the wrongful acts described herein."  SAC ¶¶ 244, 248. Keaton Schreiner is not claimed to be one of the co-conspirators, and the Court shall not consider an allegation against him that is not pleaded by Plaintiffs.

Moreover, the two exceptions to the intracorporate conspiracy doctrine are not supported by factual allegations. Plaintiffs have not alleged that the alleged conspirators had an "independent legal stake" in ordering the drugging of Plaintiffs.  Nor have they alleged that the "acts of the conspirators were unauthorized by the corporate defendant." Baltimore-Washington Tel. Co., 584 F. Supp. 2d at 744.  Indeed they alleged the opposite in their Complaint – that Bombardier is liable through the authorized and directed actions of Russell, the Rail Operations Superintendent.

It appears that Plaintiffs are attempting to use the doctrine of respondeat superior to create a civil conspiracy

29

cause of action.  They cannot do so.  They have not pleaded a plausible claim of conspiracy under Counts 23 and 24.

Accordingly, Defendant's Motion for Judgment on the Pleadings [ECF No. 40] for the conspiracy counts shall be GRANTED.

### iv. Battery

Battery is defined as "harmful or offensive contact with another person without that person's consent."  Nelson v. Carroll, 355 Md. 593, 600 (1999).  The contact must be intended to "unlawfully invade another's physical well-being."  Beall v. Holloway-Johnson, 446 Md. 48, 66–67 (2016).  In Maryland, "touching" includes "the intentional putting into motion of anything that touches another person, or that touches something that is connected with, or in contact with, another person." White Pine Ins. Co. v. Taylor, 233 Md. App. 479, 504 (2017). "[I]t is enough that the defendant sets a force in motion which ultimately produces the result."  Nelson, 355 Md. at 601.  In the intentional torts context, the "authorities abundantly support the proposition that all persons actually present, aiding, abetting, or counseling an assault, are guilty, as principals."  Sellman v. Wheeler, 95 Md. 751 (1902).

Groom has pleaded a plausible claim that he was drugged by

a Bombardier employee during a lunch meeting on December 26, 2013. SAC ¶¶ 30-33. Quigley has pleaded that he was drugged and subjected to, and failed, a randomized drug test, although he does not allege who actually drugged him. Id. ¶ 65. Quigley alleges that he "always had an open drink container with him" and that "[t]here were opportunities for Defendants and their co-conspirators to drug [his] unattended food or drink in the days leading up to [his] drug test." Id. ¶¶ 61, 66. The day of Quigley's drug test, Basore "purchased food and drink for everyone . . . and someone placed a Diet Mountain Dew on Quigley's desk, which Quigley drank." Id. at 66.

The Plaintiffs' battery allegations are sufficient to survive a motion to dismiss. They have alleged that employees of Bombardier adulterated their food or drink with Adderall without their consent. Of course, there is no determination that they will be able to produce evidence to establish the claims. Nonetheless, it appears to be undisputable that adulterating another person's drink or food with an amphetamine could qualify as nonconsensual "harmful or offensive" touching under the standard laid out in White Pine Ins. Co. and Nelson. Moreover, Plaintiffs have alleged that the alleged druggings were done at the direction of Russell, a senior manager at Bombardier, and that the information was "common knowledge"

31

among Bombardier management employees.  SAC ¶ 47.

Plaintiffs have alleged sufficient facts to present a plausible battery claim against the Defendants.

Accordingly, Defendant's Motion for Judgment on the Pleadings [ECF No. 40] for the battery claim shall be DENIED and the battery claims in Counts 6, 7 and 8 shall remain pending.

v.  <u>Intentional Infliction of Emotional Distress</u>

To establish a claim of intentional infliction of emotional distress, a Plaintiff must prove (1) conduct that is intentional or reckless, (2) conduct that is extreme and outrageous, (3) a causal connection between the wrongful conduct and the emotional distress, and (4) severe emotional distress.  <u>Batson</u>, 325 Md. at 733.  This cause of action "is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct."  <u>Kentucky Fried Chicken Nat. Mgmt. Co. v. Weathersby</u>, 326 Md. 663, 670 (1992).  The conduct must "exceed[] all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind.  The requirements of the rule are rigorous, and difficult to satisfy."  <u>Id.</u>, <u>quoting</u> W. Page Keeton, <u>Prosser and Keeton on the Law of Torts</u> § 12, p. 60–61 (5th ed. 1984).  Notably, "recovery [for intentional infliction of emotional

32

distress] will be meted out sparingly, its balm reserved for those wounds that are truly severe and incapable of healing themselves." Figueiredo-Torres v. Nickel, 321 Md. 642, 653 (1991).

Plaintiffs allege that Defendants' acts of drugging them and causing their termination resulted in severe emotional distress. SAC ¶¶ 43-44; 76-77. However, their allegations are not sufficient to plead a plausible claim. See, e.g., Figueiredo-Torres, 321 Md. at 654 (concluding a jury may find extreme and outrageous conduct when a marriage counsel hired by Plaintiff engaged in sexual intercourse with Plaintiff's wife); B.N. v. K.K., 312 Md. 135, 148 (1988) (finding a viable cause of action when defendant engaged in sex with plaintiff even though he knew he had transmittable herpes); Young v. Hartford Acc. & Indem. Co., 303 Md. 182, 198 (1985) (reversing dismissal when workers' compensation insurer insisted plaintiff undergo psychiatric evaluation for the "sole purpose" of harassing her to "abandon[] her claim, or into committing suicide").

Plaintiffs have alleged suffering a degree of emotional distress as a result of their positive drug test and termination. However, the allegations do not adequately support a claim that the distress was severe or that it was caused by the combination of the positive drug test result and the

33

employment termination.  Rather, the alleged emotional distress appears to be based upon Plaintiffs' losing their jobs and being unable to find another one.  See, e.g., SAC ¶ 43-44 (Groom's "ability to work and earn money has been diminished" and he suffered from "an inability to eat, sleeplessness, weight loss, and an inability to wake up and get out of bed," and "debilitating anxiety for approximately nine months."); ¶ 76-77 (Quigley "suffered from overeating, weight gain, and panic attacks," as well as "debilitating anxiety, panic, and paranoia . . . particularly when he was alone.").

Moreover, the act of adulterating the Plaintiffs' food or drink with Adderall, while unusual, does not rise to the level of the "extreme and outrageous" conduct  depicted in Figueiredo-Torres, B.N. v. K.K., and Young.  Recovery for intentional infliction of emotional distress is a "balm reserved for those wounds that are truly severe and incapable of healing themselves."  Figueiredo-Torres, 321 Md. at 653.  Plaintiffs have not alleged why they are entitled to this extraordinary remedy in addition to generally available economic and/or emotional detriment damages available to them should they prevail on their other claims.

Plaintiffs have not pleaded facts presenting a plausible claim for intentional infliction of emotional distress under

Counts 25, 26, 27 and 28.  Accordingly, Defendant's Motion for Judgment on the Pleadings [ECF No. 40] for the intentional infliction of emotional distress claim shall be GRANTED.

### vi. Negligent Hiring, Training, Retention, Supervision

"[A]n employer owes a duty to its employees to use 'reasonable care and caution in the selection of competent fellow servants, and in the retention in his service of none but those who are.'"  Jones v. State, 425 Md. 1, 18 (2012) (emphasis in original).  If that duty is breached, "the employer is liable to the injured employee 'not for the mere negligent act or omission of the incompetent or careless servant, but for his own negligence in not discharging his own duty towards the injured servant.'"  Id.  To establish the tort of "negligent selection, training, or retention" a plaintiff must prove that "(1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff suffered actual injury; and (4) the injury proximately resulted from the defendant's breach."  Id.

In support of their claim that Bombardier "breached" a duty of care to the Plaintiffs, they allege that Bombardier (1) had "no training programs" in place to address proper disciplinary

35

methods or employee rights under the FRSA, (2) failed to contact

prior employers of Russell, Basore, and Difatta, (3) and failed

to supervise the actions of Russell, Basore, and Difatta.[7]  SAC

¶¶ 131-134; 144-147.  Had Bombardier taken these above actions,

Plaintiffs allege, it would have found that Russell "was known

to have a drinking problem," and that Basore used drugs and "has

a . . . history of domestic violence and assault."  Id. ¶¶ 136-

37, 149-150.

    The Court finds that even if Bombardier owed the claimed

duty to the Plaintiffs and the Plaintiffs suffered injury (i.e.,

Elements 1 and 3), the allegations do not plausibly assert that

the duty was breached or that the injury resulted from that

breach.

    First, Plaintiffs have alleged that Bombardier failed to

train its employees adequately.  Plaintiffs argue that "the

essence of [their] negligent training claims is that had

Russell, Basore and Difatta been properly trained, they would

have followed legitimate disciplinary procedures, rather than

drugging their follow employees."  Pl.'s Opp. Mot. J. Pleadings

_____

[7] Plaintiffs bring Counts 9 and 10 under several theories:
negligent hiring, training, retention, and supervision.
However, their allegations regarding negligent retention and
supervision are completely conclusory and contain no facts that
might allege a plausible claim.  SAC ¶¶ 131-156.  Therefore the
Court will only address negligent training and hiring.

at 42, ECF No. 45-1.  The breach of these duties, they argue,
made the named employees a "danger to others" and constitutes a
breach of Defendants' common law duties to their other
employees.  Id.  Plaintiffs make the blanket statement that
there were "no training programs" in place at Bombardier
addressing disciplinary procedures with regard to the FRSA, but
do not address whether there are other training programs that
Bombardier has implemented.  It is not clear that the absence of
a specific FRSA disciplinary training program – as opposed to a
general program about discipline procedures and employee rights
– violates a state common law duty and establishes negligent
training.[8]

Plaintiffs allege that Bombardier failed to reach out to
these employees' former employers to ascertain the existence of
any prior unfavorable conduct, but do not allege that Bombardier
failed to do other types of background checks, such as criminal
record or credit checks.  Even if reaching out to former
employers would be an employer's duty, it is by no means clear
that a reasonable employer in Bombardier's situation would
consider Russell's or Basore's prior drug and alcohol abuse or

---

[8] Compare Jones v. State, 425 Md. 1, 32–33 (2012) (holding a jury
could find that police officers were inadequately trained by the
State in Fourth Amendment law as to whether they had the
authority to forcibly enter a home).

domestic violence incidents to render them "not competent or fit for [his] duties."  ¶¶ 141, 154.

Plaintiffs have not pled adequate facts to establish the causation element of the asserted tort claim.  Even if Bombardier did breach its duty by neglecting to hold a specialized FRSA training program or by failing to reach out to former employers during the recruiting process, it is too far a stretch to conclude that those breaches resulted in Plaintiffs' injury: i.e., being drugged and terminated for engaging in protected activities.  The lack of a training program or an exhaustive background check is not even arguably a "but for" or factual cause of the injury, let alone the foreseeable or proximate cause.  See Pittway Corp. v. Collins, 409 Md. 218, 246, 973 A.2d 771, 788 (2009) ("The question of legal causation most often involves a determination of whether the injuries were a foreseeable result of the negligent conduct.").  To find causation to be established in this case would require the Court to hold that employers could be held liable under this doctrine for any number of actions taken by their employees based solely on the existence of the employees' prior drug, alcohol, or assault allegations.

The Court finds that Plaintiffs have not stated a plausible claim against Bombardier for negligent hiring, training,

retention, and supervision under Counts 9 and 10.  Accordingly,
Defendant's Motion for Judgment on the Pleadings [ECF No. 40]
for the negligent hiring and training counts shall be GRANTED.


      vii.  <u>Tortious Interference with Contractual or
             Business Relations</u>

Plaintiffs have withdrawn their allegations under counts 29
and 30.  Pls.' Opp. Mot. J. Pleadings at 68, ECF No. 45-1.
Accordingly, Defendant's Motion for Judgment on the Pleadings
[ECF No. 40] for these claims shall be GRANTED.


III.  <u>MOTION TO AMEND THE COMPLAINT</u>

Defendants' Motion for Judgment on the Pleadings addressed
the First Amended Complaint [ECF No. 35].  Plaintiffs seek to
replace the First Amended Complaint with a proffered Second
Amended Complaint [ECF No. 50-2].  Defendants object to the
filing of the Second Amended Complaint as being made in bad
faith and futile.


    A.  <u>LEGAL STANDARD</u>

Motions to amend a complaint are to be granted in the
absence of a "'declared reason' 'such as undue delay, bad faith
or dilatory motive ..., repeated failure to cure deficiencies by

amendments previously allowed, undue prejudice to the opposing

party ..., futility of amendment, etc.'" <u>Ward Elecs. Serv.,</u>

<u>Inc. v. First Commercial Bank</u>, 819 F.2d 496, 497 (4th Cir.

1987), citing <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962). "A lack

of prejudice would alone ordinarily warrant granting leave to

amend." <u>Id.</u>


   B.   <u>DISCUSSION</u>

   By the Second Amended Complaint, Plaintiffs do not seek to

add additional claims or revise their theory of the case.

Rather, they seek only to add references to a series of text

messages purporting to support their allegations that Bombardier

employees drugged Groom and Quigley.[9]  Moreover, Plaintiffs filed

this request several months before the close of fact discovery

and Defendants have not shown "bad faith or dilatory motive" in

Plaintiffs' doing so.   <u>Id.</u>

   Defendants assert that, if filed, the Second Amended

Complaint [ECF No. 50-2] would be dismissed.  The Court

disagrees.  The Court does not find that the added content of

the Second Amended Complaint is critical for Plaintiffs.  That

_____

[9] Plaintiffs also seek to add the location of the lunch meeting
in which Groom was drugged.  ECF No. 50-3 ¶ 29.  While it is
unclear how this fact supports Plaintiffs' allegations, it is
not prejudicial.  <u>See</u> <u>Ward Elecs. Serv., Inc.</u>, 819 F.2d at 497.

is, while the said content does augment the factual allegations in the First Amended Complaint, the First Amended Complaint was adequate to avoid dismissal without augmentation.

The Court has, in this decision, reviewed the Second Amended Complaint and has determined that some, albeit not all, of the claims therein survive and shall not be dismissed.

Under the circumstances, the Court finds it appropriate to allow the filing of the Second Amended Complaint.

IV.   CONCLUSION

For the foregoing reasons:

1.   Defendants' Motion for Judgment on the Pleadings [ECF No. 40] is GRANTED IN PART and DENIED IN PART.

2.   The following claims are hereby dismissed:

   a.   All claims in Count IX and X (Negligent Hiring, Training, Retention, and Supervision).
   b.   All claims in Counts XI through XXII (Defamation) referenced by Statements 9, 10, 11, and 17.
   c.   All claims in Counts XXIII and XXIV (Civil Conspiracy).
   d.   All claims in Counts XXV through XXVIII (Intentional Infliction of Emotional Distress).
   e.   All claims in Counts XXIX and XXX (Tortious Interference with Contractual or Business Relations).

3.   The following claims remain pending:

   a.   All claims in Counts I through IV (Violation of Federal Rail Safety Act).
   b.   All claims in Count V through VIII (Battery).
   c.   All claims in Counts XI through XXI (Defamation) referenced by Statements 5-8 and 12-19.

4.   Plaintiffs' Motion to Amend the Complaint [ECF No. 50] is GRANTED.

   a.   The Second Amended Complaint [ECF No. 50-2] is deemed filed on the date of this Order.
   b.   Defendants shall answer the Second Amended Complaint by November 10, 2017.


SO ORDERED, this Tuesday, October 31, 2017.


_____/s/_____
      Marvin J. Garbis
United States District Judge